IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| INSITUFORM TECHNOLOGIES, INC., | § | |
| INSITUFORM (NETHERLANDS) B.V., | § | |
| AND INSITUFORM GULF SOUTH, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-90-1690 |
| | § | |
| CAT CONTRACTING, INC., MICHIGAN | § | |
| SEWER CONSTRUCTION COMPANY, | § | |
| KANAL SANIERUNG HANS MUELLER | § | |
| GmgH & CO. HK, AND INLINER U.S.A. | § | |
| | § | |
| Defendants. | § | |

## AMENDED[1] FINAL REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case relates to a method patent for performing pipe repair on existing underground damaged drainage pipes without removing the damaged pipe from the ground. More specifically, the method involves installing a liner into the pipe. The process described in Claim 1 of the '012 Patent claims a process for impregnating a flexible tube liner with resin prior to insertion of the liner into a damaged pipe. The liner has an impermeable film on the outside and a resin-absorbent, felt layer on the inside. A vacuum is applied to the inside of the liner by cutting a window into the outer, impermeable film, applying a cup to the outside of the window, and connecting the other end of the cup to a vacuum source. Using the created vacuum, a section of the inside of the liner is impregnated with resin, which is drawn through the liner. The vacuum cup is then moved to another section of the liner while the previously used window is sealed.

---

[1]    This document corrects a typographical error in the date listed on Page 26.

The original accused process used by Defendants was known as the "Multiple Cup Process" or "Process 1." Process 1 was a method of tube liner impregnation involving the serial application of vacuum cups. In Process 1, four to six cups were used to draw a vacuum from a corresponding number of slits in the tube liner. As a result, when the cup closest to the advancing resin was removed, and its slit was sealed, the remaining downstream cups continued to draw a vacuum in the tube liner.

At some point, Defendants switched to an alternate process, known as the "Multiple Needle Process" or "Process 2." Process 2 involved the used of multiple metal tubes or needles instead of the multiple cups utilized in Process 1. In Process 2, the needles were inserted through the layers of the impregnated tube liner, rather than merely placed over holes in the wall of the liner.

This case was tried to the Court from February 21, 1995 to February 23, 1995 on the issue of liability and on September 30, 1995, this Court found that both Process 1 and 2 were infringing under the doctrine of equivalents.  Defendants shortly thereafter modified Process 2 to a third process, Process 3, which Insituform stipulates is not infringing.

Defendants appealed the Court's final decision of infringement.  On November 6, 1996, the Federal Circuit affirmed the Court's holding in part and vacated in part due to this Court's use of an incorrect claim construction in reaching its decision that Process 1 and Process 2 were infringing under the doctrine of equivalents.  The case was thereafter remanded for new findings on this issue.

Upon remand, this Court issued revised findings on December 31, 1996, again concluding Process 1 and 2 were infringing under the doctrine of equivalents.  (Instrument No. 372, ¶¶ 23 and 24).  Defendants then appealed this Court's order finding infringement under the doctrine of equivalents and enjoining Defendants from practicing either Process 1 or 2.

2

On the 9th day of September, 1997, the above-styled and numbered case came on for trial on the issue of damages. Both sides appeared and announced ready for trial, and the case was tried to the Court from September 9 to September 12, 1997. At the conclusion of Plaintiffs' case in Chief, Defendants moved for judgment as a matter of law as to Plaintiffs' claims. The Court reserved ruling on Defendants' motions. The Court subsequently issued its findings of fact and conclusions of law on the issue of damages on September 3, 1998. (Instrument No. 496).

On November 17, 1998, the Federal Circuit issued its opinion regarding Defendants' appeal from this Court's order entered on December 31, 1996. The Federal Circuit affirmed this Court's finding that Inliner's Process 1 infringed the '012 patent, but reversed this Court's conclusion that Inliner's Process 2 infringed claim 1 of the '012 patent. (Instrument No. 496, at 1-2 and 15-16).

The Federal Circuit concluded that KM was not liable for active inducement. This Court had previously reached that same conclusion in the findings of fact and conclusions of law issued on issued on September 3, 1998. (Instrument No. 469, at 37-38). The Federal Circuit went a step further, however, and found that KM may be vicariously liable under the alter ego theory, and remanded this case to this Court for findings on the alter ego issue. (*Id.* at 15).[2] This Court had not addressed that theory of liability because it had not been previously raised by the pleadings or the evidence. The Court allowed the parties to conduct some limited additional discovery so that it could address this issue as well as the damages issue on remand. (Instrument No. 486).

---

[2]Essentially, the Federal Circuit noted that KMG is "[a] separate corporation related to KM [that] licensed the infringing technology to Inliner after KM received notice of the '012 patent." (Instrument No. 496, at 15.). The Federal Circuit reasoned that KM did not induce the infringement, but remanded the question as to whether KM was an alter ego of KMG and, therefore, vicariously liable for the infringement. (*Id.*).

3

Thereafter, Plaintiffs and Defendants filed motions to amend this Court's findings of fact and conclusions of law issued on September 3, 1998. (Instrument No. 500 and 506). KM filed a motion seeking additional findings on the alter ego issue. (Instrument No. 504).

The Court issued Revised Findings of Fact and Conclusions of Law on August 30, 1999 in light of the Federal Circuit's November 17, 1998 opinion. Defendants Cat Contracting, Inc., Firstliner U.S.A., Inc., Giulio Catallo, and Michigan Sewer Construction Company appealed this Court's order which held them liable for infringement of United States Patent No. 4,366,012, under an alter ego theory, and awarded Plaintiffs damages for that infringement. Additionally, Defendants appealed the joinder of Insituform Netherlands as a plaintiff, and the joinder of Giulio Catallo as a defendant. Plaintiffs cross-appealed this Court's ruling declining to hold Kanal Sanierung Hans Mueller GmbH & Co. KG ("KM") vicariously liable to plaintiffs under an alter-ego theory of induced infringement.

On October 4, 2004, the United States Court of Appeals for the Federal Circuit issued an opinion (1) affirming the Court's judgment of infringement with respect to all defendants; and (2) affirming the Court's joinder of Insituform Netherlands as a plaintiff, the Court's joinder of Giulio Catallo as a defendant, and the Court's ruling declining to hold KM vicariously liable for induced infringement. The Federal Circuit went on to vacate the Court's judgment that the infringement of Cat Contracting, Inc. and Firstliner U.S.A., Inc. was willful, and remanded the case to this Court for further proceedings on the issue of willful infringement in light of the recent Federal Circuit opinion in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge, Gmbh v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004) (en banc). Also, the Federal Circuit vacated the Court's damage award and remanded that issue for further proceedings and instructed the Court to determine damages based on when Defendants ceased selling the pipe repair process that was found to infringe United States Patent No. 4,366,012.

4

The case was tried by bench trial to the Court starting on March 14, 2006 for three (3) days and was continued on July 11, 2006 and ended on July 14, 2006. "[A] lower court on remand must 'implement both the letter and the spirit of the [appellate court's] mandate,' and may not disregard the 'explicit directives' of that court." *Kapche v. City of San Antonio*, 304 F.3d 493, 496 (5th Cir. 2002) (citing *Johnson v. Uncle Ben's, Inc.*, 965 F.2d 1363, 1370 (5th Cir. 1992)). "'The mandate rule simply embodies the proposition that 'a district court is not free to deviate from the appellate court's mandate.''" *Id.* (citations omitted). Accordingly, this Court only heard evidence regarding the following issues at the bench trial which took place in March and July 2006:

(1)    factual issues surrounding the date Defendants ceased use of infringing Process 1 and began use of non-infringing Process 2

(2)    damages based on the date of switch determination

(3)    determination of willfulness in light of *Knorr-Bremse*.

Likewise, these Revised Findings of Fact and Conclusions of Law relate only to these issues.

## I.    Background

Plaintiffs Insituform (Netherlands) BV ("BV"), Insituform Technologies, Inc. ("ITI"), Insituform Gulf South ("IGS") (hereinafter collectively referred to as "Insituform") are specialists in the business of pipe rehabilitation. BV, although not licensed to do business, is the record owner of the intellectual property rights to the trenchless technologies of the Insituform Process for pipeline rehabilitation.[3] (Plaintiffs' Ex. 63). BV is wholly owned by its holding company, Insituform

---

[3] Insituform's patent rights were originally held by Insituform Licensees, a subsidiary of Insituform Group Limited ("IGL") at the time of IGL's acquisition in December of 1992. The patent rights were then transferred to BV by a Sale and Purchase Agreement executed on December 7, 1992. (Plaintiffs' Ex. 63). A patent assignment dated December 3, 1992, was filed with the United States Patent and Trademark Office on December 7, 1992. Under the patent assignment, Insituform Licensees conveyed to BV "all claims for damages by reason of past infringement of said

Licensees B.V. ("Insituform Licensees"). *Id.* Insituform Licensees, also not licensed to do business, is wholly owned by INA Acquisition Corporation ("INA") which in turn is owned by ITI, the parent company. *Id.* In addition to serving as the administrative headquarters for the Insituform organization, ITI also conducts research, performs Insitutube manufacturing and product engineering. Insituform North America Corp. ("INAC"), not a party to this suit, is wholly owned by ITI and is the sister company to INA. *Id.* INAC is the domestic licensing company for the Insituform Process in the United States. *Id.* Finally, IGS is wholly owned by Naylor Industries, Inc. ("Naylor"), a wholly owned subsidiary of ITI. *Id.* IGS is authorized to do business in Louisiana, Mississippi and Texas and licensed to perform Insituform technology in designated regions throughout the United States. *Id.*

Defendants Cat Contracting, Inc. ("CAT"), Inliner U.S.A ("Inliner"), Inliner Americas ("Americas"), Kanalsanierung Hans Mueller GmbH & Co. KG ("KM") and Michigan Sewer Construction Company ("Michigan Sewer") (hereinafter collectively referred to as "Defendants") are likewise in the business of rehabilitating and restructuring various types of pipes, including sanitary, storm sewer, water main, conduit and industrial pipe. Americas operates as the holding company for its wholly-owned operating subsidiaries, CAT and Inliner. Inliner oversees the marketing of America's trenchless procedure for pipe rehabilitation to potential licensees, municipalities and industrial customers. In addition, Inliner manufacturers pipe liners and related materials which it sells to CAT and its licensees. CAT is responsible for marketing, bidding/negotiating contracts with customers and managing its pipeline rehabilitation contracts. KM is a licensee of Kanal Mueller Gruppe International ("KMG"), a German pipeline cleaning and rehabilitation company founded in

---

patents. . . ." (Defendants' Ex. 1 subexhibit D).

1951.  KM operates in Germany.  Michigan Sewer is a Michigan corporation also in the pipe rehabilitation business.

In early 1989, after reading about KM's proprietary sewer rehabilitation technology in a trade magazine, Mr. Guilio Catallo ("Catallo"), the president of CAT, contacted KM for the purpose of obtaining a license for that technology.  In March of 1989, he traveled to Europe to observe KM's process for impregnating and installing liners in underground sewer lines and to negotiate a license from KM.  On March 17, 1989, Catallo signed a letter of intent with KM to license KM's technology.[4]  Although KM stated in a letter written on November 10, 1989, that CAT was a "qualified Licensee for our KM-INLINER sewer relining process for the territories of the USA" there was no formal license agreement executed by the parties.  (Plaintiffs Ex. 11 at Ex. 11).  An actual license agreement, however, was later executed between KMG and Inliner, permitting CAT's use of "inventions for the lining of pipelines and passageways known as 'INLINER' and. . .the letters Patent therefore issued by the United States of America, being Patent No. 4,777,562."  (Plaintiffs' Ex. 7 at p. 10).  The License Agreement also stated that "[t]he Licensee has been informed of a threat of a possible claim for infringing the INSITUFORM method."  *Id.*

Catallo testified that KM told him, during his March 1989 visit, that it had been involved in a patent dispute with Insituform.  Based on this information, Catallo contacted Arnold, White & Durkee ("AWD"), a Houston-based law firm specializing in intellectual property rights, upon his return from Germany.  Catallo asked AWD to analyze the American counterparts of the patents that Insituform had used to challenge KM's patents in Germany and to advise him whether use of KM's

---

[4] KM and CAT had, at one point, contemplated entering into an license agreement—Plaintiffs produced at trial a license agreement between the parties that had never been executed.

technology would infringe such patents.  Before Catallo received AWD's opinion regarding the potential, if any, for infringement of Insituform's patents, he signed a bid on behalf of CAT Contracting and Michigan Sewer, a joint venture, to perform pipe rehabilitation services for the City of Houston, specifically, Wastewater Job Nos. 3907-7, 3907-12 and 3907-16 (hereinafter referred to the "Sims Bayou Contracts").  Catallo testified, though, he did not submit such bid until March 21, 1989, after his lawyer at AWD, Susan Knoll ("Knoll"), orally advised him that use of the KM technology would not, in her view, infringe Insituform's patents Nos. 4,009,063 ('063 patent) and 4,786,345 ('345 patent).  Knoll did not mention Insituform patent No. 4,366,012 ('012 patent),which covers the pipe rehabilitation process at issue in this case, since there was no European patent comparable to the '012 at that time.  Catallo subsequently received a detailed written report, providing the analytical basis for Knoll's earlier oral opinion of noninfringement. The report contained an analysis regarding the potential for infringement of only the '063 and '211 patents.

During the bidding process for the Sims Bayou Contracts, Catallo was sent a letter dated April 7, 1989, by Insituform's attorney, Mr. Harold James ("James"), notifying CAT and Michigan Sewer that if they practiced the process being utilized by KM, they would infringe the '063 patent and the '345 patent.  The letter did not address the '012 patent nor was Mr. Catallo notified of the '012 patent until this lawsuit was filed.  Catallo and Knoll testified that it was due to this lack of notice regarding the existence of the '012 that a written opinion concerning such patent was not prepared by AWD.  However, neither Catallo nor AWD had previously made any attempt on their own to determine what other patents Insituform owned in the United States and whether the use of the KM process in the United States would infringe these patents, if any did in fact exist.

CAT/Michigan Sewer submitted the lowest bid for the Sims Bayou Contracts and was, as a result, awarded the jobs. The Sims Bayou Contracts No. 3907-7, 3907-12 and 3907-16 were executed between the City of Houston and CAT/Michigan Sewer on 8/7/89, 10/23/89 and 11/13/89, respectively. KM assisted CAT/Michigan Sewer in the performance of these jobs by demonstrating to CAT/Michigan Sewer in March of 1989, the two cup German Inliner vacuum impregnation technique Catallo had earlier observed and by training CAT/Michigan Sewer's personnel to properly use such technique. From this method of impregnation, the Multiple Cup Process ("Process 1"), which utilizes a plurality of vacuum cups to draw a vacuum from a corresponding number of slits in a liner that had been inserted into the pipe to be repaired, was developed by CAT and Inliner. Process 1 was used to complete the Sims-Bayou Contracts. On February 2, 1990, Insituform filed an original complaint against Defendants in the Eastern District of Michigan, alleging infringement not only of the '063 and '345 patents, but also of the '012 patent. In May of 1990, the case was transferred to the Southern District of Texas. Insituform filed an amended complaint in this court, realleging infringement of the '063 and '012 patents but dropping charges relating to the '345 patent. Defendants filed an answer, asserting, among other things, that the patents had not been infringed.

In June 1991, after a two-week trial conducted by Judge Lynn Hughes, a jury returned a verdict that included the finding that both patents were infringed. Defendants filed motions for new trial and judgement notwithstanding the verdict. On August 28, 1991, Judge Hughes partially granted Defendants' motions, ordering judgment notwithstanding the verdict finding that there was no literal infringement of the '063 and the '012 patents and granting a new trial on the issue of infringement under the doctrine of equivalents. The matter of damages had previously been bifurcated from the

9

issue of infringement by order of the Court dated March 5, 1991, and was not part of the judgment issued.

Following the conclusion of the first trial, Inliner began using a second process for pipe rehabilitation, Process 2. Process 2 entails the use of tubes or "needles", instead of vacuum cups as in Process 1, which are positioned along the liner to create a continuous vacuum. Catallo testified that the shift from cups to needles was based in part on the fact that needles did not fall, as did the cups, from the outer felt layer of the liner and in part on Knoll's belief that infringement of the '012 was less likely if needles were used. Catallo also testified that CAT/Inliner taught only Process 2 to their licensees, the first of whom was authorized to use the Inliner technology in 1992.

## II.   Damages Trial

The damages portion of this case was originally tried on September 9, 1997. Insituform claimed that IGS, the exclusive licensee of Insituform technology in the United States, was entitled to recover its lost profits, which amounted to $10.5 million, on those jobs for which IGS and CAT/Inliner directly competed but which were ultimately awarded to CAT/Inliner. ITI contended that it was entitled to recover its lost profits, in the amount of $7.7 million, on the liners it would have sold to IGS had IGS been awarded the jobs performed by CAT/Inliner. With respect to infringement by CAT/Inliner licensees, Insituform maintained it should be awarded no less than a reasonable royalty, in accordance with 35 U.S.C. § 284, calculated at a royalty rate of 20.5 % for a total of $6.2 million because CAT/Inliner actively induced infringement by their licensees. Finally, Insituform asserted that it was entitled to enhanced damages and attorneys' fees for Defendants' willful infringement and approximately $6.8 million in pre-judgment interest.

In contrast, Defendants argued that neither IGS nor ITI have standing to sue since neither entity was the legal owner or exclusive licensee of the patent in issue, thereby precluding their entitlement to monetary damages under the Patent Act. Defendants next argued that the true owner of the patent, BV, had not been joined as a party to this suit and as a result, there was no evidence in the record to support any award of damages in its behalf. Defendants also claimed that adding BV as a party plaintiff at that late date would be unduly prejudicial to Defendants' case. At a minimum, Defendants claimed, if BV was joined as a party, it was only entitled to reasonable royalty damages at a rate of no more than .4%. If both IGS and ITI had standing to sue, Defendants contended that the measure of damages should be a reasonable royalty and not lost profits since neither IGS or ITI had met their burden of proof with regard to lost profit damages. KM, however, denied liability for damages because, it contended, there was no proof that it induced infringement. Absent such proof, KM argued, it could not be held jointly and severly liable for any damages Insituform sustained as a result of the proven infringement. Inliner and CAT also maintained that they could not be held liable for inducing infringement and that any damages Insituform had requested as a result of CAT/Inliner licensees' alleged infringement were therefore unwarranted. In addition, Inliner and CAT contended that Insituform failed to adduce proof that their infringement was willful, thereby negating Insituform's claim for enhanced damages and attorneys' fees and that any prejudgement interest awarded should be computed as simple interest and not compounded, with the period during which Insituform did nothing to prosecute this action—July of 1992 through June of 1994—excluded from the computation.

## III.    Date of Switch

The previous damages trial before this Court was conducted under the assumption that both Process 1 (cups) and Process 2 (needles) infringed the '012 Patent. Subsequently, however, the Federal Circuit determined that only Process 1 infringed the '012 Patent, and that the primary fact issue related to damages that needed to be determined by this Court was the date on which Defendants stopped using the infringing Process 1 and started using the non-infringing Process 2. While this Court has previously considered the issue of the process switch date as related to damages, the Court did not conduct trial-type proceedings to resolve the issue.  As a result, in the Federal Circuit's most recent opinion, this Court's findings were vacated and remanded for consideration of the date of switch issue so that this evidence could be properly weighed, in a trial-type proceeding. This also required the Court to make new findings regarding the quantum of damages attributable to the infringing Process 1. Therefore, on March 14, 2006 for three days and continuing on July 11, 2006 through July 14, 2006, the Court heard testimony from witnesses and evidence was presented on the date of switch issue to assist the Court in making a new damage determination.

Plaintiffs contend that Defendants used Process 1 (cups) from March 12, 1989 until at least October 28, 1994. Further Plaintiffs contend that even if Defendants did switch processes mid-way through a job, the entire job should be used to calculate damages, as 35 U.S.C. § 271 (a) covers infringement for offers for sale. Plaintiffs rely heavily on a Motion for Summary Judgment submitted in 1994 to the Court as the source for their proposed switch date of October 28, 1994. On the other hand, Defendants contend that they switched from the use of cups (Process 1) to needles (Process 2) as early as February 1991, but no later than August 1991. In support of this contention, Defendants, at trial, relied on two invoices for Avanti needles dated on or around March 2, 1991. Additionally, Defendants called Robert Hanna to testify about the switch date. It is undisputed that

12

Robert Hanna's deposition taken on February 7, 1991, makes no mention of needles. Robert Hanna did, however, testify, based on diary entries he had made, that the date of the switch from cups to needles was February 14, 1991. Further, Defendants called Braxton Coles as a witness during the trial, a CAT employee who was hired at the end of August 1991 to work out of CAT's Scranton facility. Importantly, Braxton Coles testified that he could not remember a time when cups were used, as the use of such cups was taboo because they infringed the Insituform patent.

To better facilitate the Court's analysis of the date of switch issue, and given the myriad switch dates presented by both Plaintiffs and Defendants, the Court believes it to be most appropriate to construct a continuum that includes every possible date the switch from Process 1 (cups) to Process 2 (needles) could have occurred. From that, the Court will analyze the possibility of whether any date on the continuum is a plausible date on which the switch from Process 1 to Process 2 could have taken place, eliminating dates that are implausible and ultimately leaving the Court with the most accurate switch date. The following dates were either proposed by Plaintiffs or Defendants in briefing, mentioned at trial, or contained in the deposition testimony before the Court, and, as such, the Court will analyze each of these dates starting with the two extremes first and working its way to the dates which comprise the middle of the continuum:

(1) February 1991

(2) August 1991

(3) December 1991

(4) October 1994

First, as stated, Robert Hanna ("Hanna") testified at trial that the switch date from cups to needles was February 14, 1991. Hanna was an employee of Catallo's from 1990 to 2002, and has

been involved in this litigation since its inception. During his testimony in this most recent trial, Hanna

stated that the switch from cups to needles took place on February 14, 1991–this statement was based

on a notation in his diary related to when Catallo's companies moved their activities to a new address

on Scranton Road. Hanna conceded, however, that he could not be sure that they were using needles

exclusively beginning February 1991. Further, Hanna emphasized that the switch to needles was never

urgent because Catallo had been advised by attorneys that the use of cups would not infringe the '012

Patent. It was not until later (after February 1991) that the use of cups (Process 1) was found to

infringe the '012 Patent. Hanna's testimony is the only evidence that speaks to the February 1991

alleged switch date. Obviously, the complete switch from Process 1 to Process 2 could not have taken

place in February 1991, as Hanna's testimony more than confirms the idea that CAT/Inliner simply

began experimenting with needles at that time. That CAT/Inliner was experimenting is indeed

evidence that the companies had begun to contemplate the switch from cups to needles, but it is no

way evidence that a total switch had been made. Because of this, the Court rules out February 1991

as the switch date.

　　　　At the other end of the continuum, Plaintiffs argue that the date of switch from cups to

needles occurred on October 28, 1994, which would make Defendants responsible for infringing the

'012 Patent from March 12, 1989 to October 28, 1994. The October 28th switch date is derived from

Defendants' 1994 Motion for Summary Judgment. In that Motion, Defendants indicated to the Court

that "Inliner no longer utilizes the cups or forms windows in the plastic membrane in the method of

impregnation in the method utilized since the trial." (Pl. Trial Exh. 199; *see also* Instrument No. 178,

p.27 n.5). The crux of Plaintiffs' argument is this: if Defendants had in fact switched from using cups

to needles completely before the October 1994 date, Defendants would have notified the Court of

such switch before filing their Motion for Summary Judgment in 1994. On the face, this contention seems plausible, until one considers the unique circumstances of this case. The contention that the October 1994 switch date should be established from pleadings filed in this case is drastically weakened by an examination of the docket sheet. In fact, there was virtually no legal activity in this case from around late 1991 until June 1994, when the case was reassigned from Judge Lynn Hughes to this Court. Following Judge Hughes' order, dated August 28, 1991,  granting a judgment notwithstanding the verdict on the issue of literal infringement of the '603 Patent and the '012 Patent, the entries that follow are related to the appeal to the Federal Circuit, motions to substitute attorneys, and an oral order entered on July 23, 1992 that Judge Hughes took a motion for judgment on the pleadings under advisement. On June 20, 1994, the case was reassigned to this Court, and shortly thereafter the Court ordered the parties to submit a joint status report and a scheduling order was put in place, which required the parties to file all dispositive motions by October 28, 1994. Now, Plaintiffs assert that that October 28, 1994 date is the most logical switch date because when Defendants' Motion for Summary Judgment was filed with the Court on that date, Defendants indicated in that pleading for the first time, a switch from cups to needles. When this case finally resumed in late 1994/early 1995, there was a flurry of activity with regard to Defendants showing what process they had been using. This was no indication, however, that the pleadings bore any relationship to when the switch took place. It appears logical to the Court that Defendants did not reveal the switch from cups to needles sooner than the filing of their Motion for Summary Judgment in 1994 when the case practically ran stale and was inactive for more than two years.  Plaintiffs offer no additional evidence to support or prove up the October 1994 switch date. Simply because the Motion for Summary Judgment was allegedly the first time Defendants made mention of the switch from cups to needles,

15

the Court will not infer from that alone that Defendants made the switch on that date specifically. The evidence before the Court points to a much earlier switch date, and the Court is obliged to consider and examine evidence in order to ascertain a much more accurate and plausible switch date. Accordingly, the Court rejects Plaintiffs' contention that Defendants did not completely switch from Process 1 to Process 2 until October 28, 1994.

Alternatively, Plaintiffs argue that the date of switch took place no earlier than December 1991. This date, however, is not supported by any of the evidence in the record or by any of the testimony heard at trial. It appears as though the December 1991 switch date was randomly selected by Plaintiffs, as they point to nothing in the record that makes that date plausible. On the contrary, the evidence points to a much earlier switch date.

Lastly, the Court will analyze whether the last remaining date on the continuum, August 1991, is a plausible switch date given the evidence presented and the testimony heard at trial. With respect to this date, the Court finds four things most compelling: (1) the testimony of Braxton Coles; (2) the testimony of Robert Davis; (3) the testimony of Alan Thomas; and (4) the March 1, 1992 blueprint presented as Plaintiffs' Exhibit 41.

Braxton Coles ("Coles") was an Insituform employee from 1986 to 1990. In August 1991, Coles was hired by CAT to work in the Scranton facility, and he remained a CAT employee until 2002. Coles testified that he would occasionally go out and observe wetouts from time to time at the Hanson facility, and that needles were being used. Coles was able to recall the use of needles because he was used to seeing cups used, having worked for Insituform for several years. Further, Coles testified that while he heard rumors that cups were being used at a San Diego facility, he could not be sure about when the cups were being used there. Specifically, Coles testified that "the use of cups

16

was taboo" because the use of such infringed the Insituform patent. While Coles was not able to state the date of the first use of needles, Coles did testify that he could not ever remember seeing cups used during his employment with CAT. Coles is indeed familiar with the Insituform process and his testimony is uncontroverted. If cups had been in use at the time Coles began working for CAT, Coles would have undoubtedly remembered such given his familiarity with Insituform's process and his knowledge about Defendants' problems, regarding infringement, with Insituform's '012 Patent.

Next, Robert Davis' ("Davis") testimony at trial serves to further substantiate Coles' belief that the switch from cups to needles had occurred at least by August 1991. Davis was hired by Catallo and his companies on August 5, 1991. Davis testified that he could not be sure when the switch occurred exactly because when he began working for Catallo, needles were being used. He stated that he was not sure whether there were any documents distributed prior to his employment to memorialize the switch date, but even without this knowledge, Davis maintained that cups were never used while he was an employee of Catallo and his companies. Plaintiffs attempt to discredit Davis' testimony by stating that because he never had any discussions with anyone about the switch from cups to needles for the resin impregnation process, Davis has no knowledge of when the switch actually occurred. Plaintiffs' contention does not explain, however, why Davis only observed the use of needles when he began working for Catallo and his companies in August 1991. Given this, it seems logical that no such discussion ever took place, as it would have been unnecessary because the switch had already occurred.

To further support the August 1991 date as the actual switch date, Alan Thomas ("Thomas"), a resin salesman who called on the Catallo companies, testified at trial that the switch had to have occurred during the first half of 1991 because that was the time Catallo stopped using Thomas'

company to buy resin. Plaintiffs' Exhibit 86, "1991 *Sales Forecast/Salesperson: Alan Thomas*"
validates Thomas' theory. Specifically, the Exhibit includes three columns, "1990 Actual;" "1991
Forecast;"and "1991 1st 6 months Actual," respectively. (Pl. Trial Exh. 86). The Exhibit also shows
all of the individual accounts associated with the purchase of resin for the respective years.
Importantly, the total dollar amount of resin actually purchased in 1990 was $2,207,000, while the
total actual dollar amount in the first six months of 1991 was only $523,520–only roughly 25% of the
amount that had been purchased in previous years. (*See id.*). These figures are telling as far as the
switch date is concerned because they show a significant decrease in resin sales, which makes the
August 1991 date an even more logical switch date in light of Thomas' testimony. Thomas testified
that the last delivery of resin was made during the first half of 1991, prior to losing the resin account
to Dow, and that during that time he recalled seeing needles at the Hanson facility where he visited
daily. The Court is persuaded by Thomas' testimony which ties the switch date, roughly, to the date
that Dow took over financing and resin supply.

Lastly, the Court finds Plaintiffs' Exhibit 41, the March 1, 1992 blueprint, to be persuasive
evidence that further buttresses Defendants' contention that the switch from Process 1 to Process 2
occurred no later than August 1991. Basically, the blueprint outlines Defendants' process using
needles and includes in the bottom right-hand corner a date of March 1, 1992. The blueprint was
intended for distribution to Defendants' licensees–namely, Defendants' first licensee Reynolds
Construction. Robert Davis testified that shortly after he began his employment he had been made
aware of the blueprint showing the use of needles. Additionally, Catallo testified at trial that the
blueprint is the best written evidence to prove that Defendants had completely switched from cups to
needles by no later than August 1991, as it outlines Defendants' needle process completely. And

18

logically, the use of the needle process or Process 2 would have had to have been well under way in order for blueprints, intended for distribution to licensees, to have been drafted by March 1992. At the very least, the blueprint demonstrates that the needle process was much more than an experimental idea at the time of the its construction, but rather a fully conceptualized process that was clearly being used by Defendants in lieu of cups. Plaintiffs contend that the March 1, 1992 date was added to the blueprint after the Court's original findings were entered in 1995. There is, however, no evidence to support this assertion and the Court rejects Plaintiffs' attempt to categorize the March 1, 1992 blueprint as "suspect." (Plaintiffs' Post-Trial Proposed Findings of Fact and Conclusions of Law, at 10).

Through a process of elimination, the Court has ruled out the October 1994, February 1991, and December 1991 switch dates. The Court's review of the evidence simply does not support any of these switch dates, as the evidence shows that: (1) without question the switch from cups to needles took place prior to October 1994; (2) February 1991 is implausible given the fact that there was testimony heard that proves Catallo's companies had merely started experimenting with the use of needles during that time; and (3) nothing in the record supports December 1991 as the switch date. Therefore, this Court is left with August 1991. As stated, at least three witnesses during the trial pointed to, either roughly or specifically, August 1991 as the switch date. Most importantly, two employees who were hired by Catallo during that same month both testified that they did not ever remember seeing cups used by Defendants upon the commencement of their employment. Plaintiffs' attempts to discredit these two witnesses are to no avail, and the Court finds the testimony of Davis and Coles to be most compelling. Moreover, the Court is unconvinced that Mr. Raymond Heinrich's ("Heinrich") testimony regarding his observations at the San Diego facility are reliable indicators, as

he was only a sales manager for Insituform. Further, his testimony confirms that while he visited the facility in 1996 and again in 2006 and took photographs, Heinrich had no expertise or experience with the patented process and therefore, he had neither any idea what the patent actually required nor any understanding of whether what he observed was infringing. Accordingly, based on the evidence presented and the testimony heard at trial, the Court finds that the most plausible switch date is August 5, 1991.

Given this determination, the Court must now proceed with an analysis of the appropriate amount of damages to be awarded to Plaintiffs in this case based on the August 5, 1991 switch date.

## IV.  Damages

The Court previously entered damages findings in its opinion issued on August 31, 1999. The Federal Circuit vacated that previous damage award, and the mandate instructed the Court to make a new determination of damages by determining the date on which Defendants ceased selling the infringing process. The Federal Circuit did not take issue with the manner in which the Court previously calculated the royalty rate to be applied and accordingly, the Court finds that no revision of that analysis is necessary. Furthermore, this Court held that all recoverable damages would be awarded to BV and that Insituform's corporate structure and the distribution of any monies ultimately awarded BV was not relevant to the Court's damage analysis, and the Court likewise finds that no revision of that analysis is necessary. Given, however, that the previous analysis of the royalty rate to be applied occupied some twenty-seven pages of the Court's opinion, a brief summary is provided here.

Previously, the Court dealt with Plaintiffs' damages proof in two distinct categories: (1) damages owed by CAT/Inliner and Michigan Sewer for direct infringement in the Gulf Coast Market

20

and damages owed by CAT/Inliner and KM for actively inducing infringement by CAT/Inliner licensees. (Instrument No. 522, at 22). Insituform maintained that "it would have been reasonable for ITI, . . . to have agreed, in hypothetical negotiations with [CAT] . . . for a royalty figure of 20.5%." (*Id.*, at 25). Defendants, on the other hand, argued that "the ready availability of a non-infringing, substitute method for impregnating resin would favor a low royalty rate." Additionally, in further support that a low royalty rate should be used, Defendants produced evidence which Defendants claim indicates that Insituform itself did not highly value the '012 Patent. (*Id.*, at 26). Defendants also asserted that Insituform licensees payed the same royalty rate–8%–both before and after the issuance of the '012 Patent, which, according to Defendants, meant that Insituform licensees essentially "received the right to practice the '012 method at no additional charge." (*Id.*). Defendants further argued that approximately 7/8 of the 8% royalty rate paid by Insituform licenses was to compensate Insituform for "trademark rights, marketing, advertising, and know-how, and the 'inversion' technology." (*Id.*, at 26-27). This left, in Defendants' opinion, only "1% to be apportioned among a variety of other patents licensed to [Insituform] licensees." (*Id.*, at 27).

The Court found that Defendants presented a creative but unpersuasive argument that the 8% royalty rate paid by Insituform licensees should be apportioned amongst the different components of the patented technology. (*Id.*, at 30). The Court went on to state that without presenting any evidence to support such view, Defendants argue that the '012 Patent should be valued, at the most, at 1% of the royalty amount. (*Id.*). The Court found, however, that there was no provision in Insituform's licensing agreement which would permit a licensee to select for its use only certain portions of the patented technology while excluding the remainder for a discounted royalty rate. (*Id.*). Further, the Court found that Defendants' expert calculated damages that were numerically accurate but factually

21

erroneous because such calculations were based on Defendants' premise that the royalty rate attributable to the '012 Patent should be 1%. (*Id.*). The Court also found that there were no available alternatives for the Insituform Process. (*Id.*, at 31). Also, the Court concluded that the fact that Insituform and Defendants are competitors strengthened the patent owner's bargaining position and weighed against fixing a lower royalty rate. (*Id.*, at 32) (citations omitted).

Moreover, the Court found that, contrary to Defendants' expert's, Walter Bratic ("Bratic"), report, the '012 Patent did have value independent of Insituform's other patents (*Id.*). Specifically, the Court discussed the fact that sequential vacuum impregnation under the '012 Patent was more efficient and cost effective than other technology available at the time of infringement. (*Id.*). Further, the Court pointed to the fact that the City of Houston required that sewer rehabilitation in the Sims-Bayou Collection System be "accomplished by the use of the 'Insituform Process' or an approved equal." (*Id.*).

Additionally, the Court found that the various steps (including the products used in the performance of these steps) involved in the impregnation process, such as inverting the pipe with a tubular liner, cannot be considered in isolation but must be considered as a "functional unit," thereby entitling BV to include in the damage computation for reasonable royalty purposes ITI's profits on liner sales. (*Id.*, at 33). In addition to considering the various steps involved in the impregnation process, the Court also considered the possibility that it is questionable whether Insituform had the capacity to perform all of the work Defendants completed with the use of the infringing process, though the '012 Patent had value and worth apart from Insituform's other patents. (*Id.*).

The Court determined that, with respect to the damages sustained by Insituform based on lost profits on jobs performed by CAT/Inliner, the actual profits which would have been recoverable by

IGS could not be considered due to lack of standing. (*Id.*, at 34). The Court did consider, however, three other components to those damages that would be recoverable by the patent owner–the defacto royalty from lost profits on the liners (under the entire market rule), the royalty that it would have received had the infringer been licensed and any reasonable crossover fee. (*Id.*). In assessing the royalty base, Insituform originally proposed that the value of the contracts awarded to CAT instead of IGS, its own licensee, was $50,212,379. (*Id.*). Defendants proposed total was $43,073,367 which according to Defendants' expert Bratic, did not include jobs after 10-3-95 when CAT began using the non-infringing Process 3. (*Id.*). The figures that were provided by both parties previously included jobs that were performed using Process 2 which had been determined to be non-infringing by the Federal Circuit. (*Id.*, at 34-35). Based on that finding, the Court deemed it necessary to determine the value of the contracts involving Process 1 only. (*Id.*, at 35).

After the Court determined which CAT Contracting jobs would be considered for purposes of determining the value of the contracts awarded to CAT instead of IGS, the Court had to decide which royalty base would be applied to that figure (the contract amount for jobs performed through 1991 was $9,313,341). (*Id.*, at 36). The parties disagreed on the calculation of the royalty base to be applied to that figure. All parties agreed that the deductions of 14.63% from the contract total was reasonable. (*Id.*). The Court, however, disagreed with Defendants belief that an additional 12.12% of costs attributable to other work performed as part of the wet out or rehabilitation process should be deducted, including cleaning, remote camera inspection, trimming the end and inspecting the entire length of the pipe at the conclusion of the job. (*Id.*, at 36-37). The Court found that under the entire market rule, it was not reasonable to exclude the costs of these additional items from the contracts in calculating the royalty base. (*Id.*, at 37). Accordingly, the Court concluded that it would use a royalty

base rate of 85.37%. (*Id.*). Given the royalty base rate of 85.37% multiplied by the value of contracts lost of $9,313,341, the Court determined the royalty base to be $7,950,799. (*Id.*).

Further, as to the determination of the reasonable royalty rate, Defendants' expert Bratic testified that the anticipated gross profits at the time the contract would have been negotiated were 25%. (*Id.*, at 38). The Court found the actual gross profit figure useful in determining what might have been a reasonable royalty rate at the time negotiations would have taken place. (*Id.*). Given that anticipated profits were 25%, the Court considered that as the upper limit in determining what a reasonable royalty rate might have been. (*Id.*, at 38-39). The Court also took into consideration the reasonable profit that the infringer made in this case, 9.72% to arrive at its finding that a reasonable royalty rate would have been 15.28%. (*Id.*, at 39). Accordingly, the Court found that damages should be calculated by multiplying the reasonable royalty rate of 15.28% times the royalty base of $7,950,799, for actual damages related to the Gulf Coast Market of $1,214,882. (*Id.*).

With respect to the Sims-Bayou Contracts, the parties stipulated that Process 1 was used by CAT/Inliner and Michigan Sewer in the performance of the Sims-Bayou Contracts and that CAT/Inliner and Michigan Sewer were jointly and severally liable for any damages caused as a result of such infringement. (*Id.*). Also, the Court found that Michigan Sewer was jointly and severally liable with CAT/Inliner only for the jobs in which they were involved. (*Id.*). The evidence showed that Michigan Sewer was involved in only four contracts which were performed in 1990 and 1991. (*Id.*). The total revenue on those jobs was $5,967,647. (*Id.*). The application of the royalty base rate of 85.37% resulted in a reasonable royalty base of $5,094,580. (*Id.*). Additionally, the application of the same reasonable royalty rate of 15.28%, the damages for which Michigan Sewer was held to be jointly and severally liable were $778,452 plus pre-judgment interest. (*Id.*, at 39-40).

24

Additionally, the Court previously addressed Defendants argument that there was no evidence from which it could be determined that Defendants' licensees used the infringing process or that they induced such infringement. (*Id.*, at 45). While the parties stipulated that Defendants taught Process 2, the Court found that they did not negate the possibility that Defendants also taught Process 1. The Court relied on the response of Defendants' licensee Lanzo Lining to conclude that Defendant did teach or at least give directives about Process 1. (*Id.*, at 48). Accordingly, the Court found that the stipulations and statistical evidence, when taken together, showed that Defendants taught their licensees both processes and that at least 50% of their licensees used Process 1 and at least 50% of them used Process 2. (*Id.*).

With respect to the damages sustained by Insituform based on the lost profits on jobs performed by the Inliner licensees and on CAT contracting jobs outside of the Gulf Coast Market, Insituform asserted and the Court agreed that the royalty revenue totaled $30,684,385 (CAT jobs totaling $1,344,372 and licensee jobs totaled $29,340,013. (*Id.*). The Court used the royalty rate of 15.28% applied to that figure to arrive at actual damages, but based on the Federal Circuit's finding that only Process 1 was infringing, the Court agreed with Insituform that the amount of damages attributable to licensee activity should be cut in half. (*Id.*). Accordingly, based on the royalty rate of 15.28%, the Court found that damages related to the work by CAT/Inliner licensees and by CAT jobs outside of the Gulf Coast Market where they used Process 1 totaled $2,344,287. Lastly, the Court found that there was no evidence to prove that Michigan Sewer actively induced others to infringe the '012 Patent; and as such, Michigan Sewer could not be held liable for inducement. (*Id.*, at 49).

This damage award previously entered by this Court was vacated, as the Federal Circuit determined that "the procedure chosen by the district court in this case was tantamount to a 'trial by

affidavit' . . . ." *Insituform Technologies, Inc., et al. v. CAT Contracting, Inc., et al,* 385 F.3d 1360, 1376 (Fed. Cir. 2004). Further, the Federal Circuit vacated and remanded the issue of damages with instructions to conduct trial-type proceedings, and with instructions to "properly weigh the new evidence regarding the quantum of damages attributable to infringing Process 1." *Id.* at 1377.

Heeding the Federal Circuit's admonishment, this Court has determined a switch date, August 5, 1991, based on the evidence presented and the witnesses' testimony during the bench trial that took place on damages. Accordingly, Plaintiff is ordered to provide the Court with new damage figures based on that switch date. In accordance with the Court's earlier findings, the previously determined royalty base rate of 85.37% should be used to calculate an accurate royalty base figure–multiplying that figure times the value of the contracts lost based on the Process switch date determined by this Court. Further, actual damages should be calculated by multiplying the reasonable royalty rate of 15.28% times the newly determined royalty base figure.

## V.   **Willfulness**

35 U.S.C. section 284 authorizes the court to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The decision to award enhanced damages is "committed to the district court's discretion." *Spindelfabrik Sussen-Schurr Stahlecker & Grill v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft,* 829 F.2d 1075, 1083-84 (Fed. Cir. 1987). However, "[i]n order to support such an increased, punitive award there must be a finding that the infringement was willful. The existence of honest doubt concerning the validity of a patent precludes a finding of willfullness." *Eltra Corp. v. Basic Inc.,* 599 F.2d 745, 757 (6th Cir. 1979); *Enterprise Mfg. Co. v. Shakespeare Co.,* 141 F.2d 916, 921 (6th Cir. 1944) ("If honestly mistaken as to a reasonably debatable question of validity, an infringer should not be made to smart in punitive

damages.  Compensatory damages constitute adequate remuneration for invasion of a patentee's property rights, unless the refusal of the infringer to bow to the presumptive validity of an issued patent is consciously wrongful.").  Furthermore, "[a]n increase in damages for willfullness. . . is generally inappropriate when the infringer mounts a good faith and substantial challenge to the existence of infringement." *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 20 (Fed. Cir. 1984).

Whether infringement is willful is "by definition a question of the infringer's intent", which may be "resolved by evaluating the totality of the surrounding circumstances." *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 943 (Fed. Cir. 1992); *Gustafson, Inc. v. Intersystems Industrial Products*, 897 f.2d 508, 510-511 (Fed. Cir. 1990) ("Whether an act is 'willful' is by definition a question of the actor's intent, the answer to which must be inferred from all circumstances.").  The following factors have been utilized in assessing the infringer's culpable state at the time of the infringement:

> (1) whether the infringer deliberately copied the ideas or design of another; (2) whether
> the infringer, when he knew of the other's patent protection, investigated the scope of
> the patent and formed a good-faith belief that it was invalid or that it was not infringer,
> and (3) the infringer's behavior as a party to the litigation.

*Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed. Cir. 1986).

"The patentee bears the burden of persuasion and must prove willful infringement by clear and convincing evidence." *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1368 (Fed. Cir. 2006).  No evidentiary presumption exists that every infringement is willful. *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004).  The patentee must provide threshold evidence of

27

culpable behavior before the burden of production shifts to the accused to prove that it acted with due care. *Golden Blount, Inc.*, 438 F.3d at 1368. That threshold showing cannot be satisfied merely by demonstrating the failure to produce an opinion letter. *Id.*; *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GMBH v. Dana Corp.*, 383 F.3d 1137, 1343 (Fed. Cir. 2004).

In its earlier ruling on this matter, this Court held that "due to a complete absence of competent advice regarding possible infringement of the '012 patent . . . the Court finds that actions of CAT/Inliner's evidenced the degree of willfulness necessary to support the award of enhanced damages." *Insituform Technologies, Inc. v. CAT Contracting, Inc.*, No. H-90-1690, 1999 WL 33914622, at *29 (S.D. Tex. Aug.30, 1999). The Federal Circuit overturned this holding due to its decision in *Knorr-Bremse*, overruling prior precedent on this issue. *See Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1377 (Fed. Cir. 2004) (holding "[b]ecause elimination of the adverse inference arising from failure to obtain an opinion of counsel is a material change in the totality of the circumstances in this case, a fresh weighing of the evidence is required . . . . we vacate the district court's willfulness finding and remand for further proceedings."); *see also Golden Blount, Inc.*, 438 F.3d at 1368 (noting "this court's precedent had [until *Knorr-Bremse*] aided the patentee in making its case on willfulness by permitting the trier of fact to infer from an alleged infringer's failure to produce and opinion letter that such an opinion, if rendered, was or would have been unfavorable to the alleged infringer.").

A determination of willfulness is made on consideration of the totality of the circumstances. *Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d at 1377. Now, "the failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or evidentiary presumption that such an opinion would have been unfavorable." *Knorr-Bremse*, 383 F.3d at 1346.

Rather, the patentee is free to introduce as evidence whatever opinions were obtained and to challenge the competence of those opinions to meet the burden on willfulness. *Golden Blount, Inc.*, 438 F.3d at 1368.

Plaintiff asserted at trial that *Knorr-Bremse* did not apply in this case because this Court did not base its determination of willfulness on an adverse inference arising from the failure to obtain an opinion of counsel–Plaintiff is alone in that belief. Lest there is any confusion, the Court acknowledges here that the Court made such a determination. Additionally, the Court believes that it is clear from this Court's original opinion, as well as the Federal Circuit's decision to vacate and remand that this Court did make such an inference. *See Insituform Technologies, Inc., v. CAT Contracting, Inc.*, No. H-90-1690, 1999 WL 33914622, at *28 (S.D. Tex. Aug.30, 1999) (stating "[a]n alleged infringer who intentionally blinds himself to the facts and law, continues to infringe, and employs the judicial process with no solidly-based expectation of success, can hardly be surprised when his infringement is found to be willful") (quoting *Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 n.11 (Fed. Cir. 1986)); *see also Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d at 1377 (stating "such an [adverse] inference was one factor upon which the district court based its willfulness determination in this case") and *Golden Blount, Inc.*, 438 F.3d at 1369 (holding that an adverse inference "would have been an improper basis upon which to rest a willfulness finding, and citing *Insituform Technologies, Inc. v. CAT Contracting, Inc.*, 385 F.3d at 1377 as "vacating the district court's finding of willfulness for drawing the type of negative inference prohibited by *Knorr-Bremse*").

At the most recent trial, Plaintiff chose not to introduce any evidence related to what opinions were obtained, nor to challenge the competence of those opinions, in order to meets its burden on

willfulness. *Golden Blount, Inc.*, 438 F.3d at 1368. Therefore, this Court finds that, in evaluating the totality of the circumstances, the actions of Defendant did not evidence the degree of willfulness necessary to support a finding of enhanced damages under *Knorr-Bremse*. Further, because the Court has now found that Defendants did not willfully infringe the '012 Patent under *Knorr-Bremse*, Plaintiffs are no longer entitled to enhanced damages pursuant to 35 U.S.C. § 284.

A.    **Attorney's Fees**

Under section 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. An award of attorney's fees under this section is within the discretion of the trial court but such an award must be based on a specific finding of exceptional circumstances, which must be proven by clear and convincing evidence. *See Cambridge Products, Ltd. v. Penn Nutrients, Inc.*, 962 F.2d 1048, 1050 (Fed. Cir. 1992) (holding that "the exceptional nature of the case must be established by clear and convincing evidence); *Hughes v. Novi American, Inc.*, 724 F.2d 122, 124 (Fed. Cir. 1984) ("While an award of attorneys fees is to be reviewed under the standard of whether such award constitutes an abuse of discretion, an award must be set aside if it is unsupported by adequate findings of the basis for the award, thereby precluding meaningful review."); *Raytheon Co. v. Roper Corp.*, 724 F.2d 122, 124 (Fed. Cir. 1983) (holding that the court has the discretion to award attorney's fees).

"Exceptional circumstances" may include, but is not required to, willful or deliberate infringement or inequitable conduct engaged in by the defendant during litigation. *Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed. Cir. 1988) ("Although an award of attorney fees, because discretionary, does not automatically follow from the willfulness of an infringement. . . the willfulness of the infringement by the accused infringer may be a sufficient

basis in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner."); *Kahn v. Dynamics Corp. of America*, 508 F.2d 939, 944-45 (2d Cir. 1974). "Because [willfulness of infringement] may be seen as producing an unnecessary and outcome-certain law suit, it may make the case so exceptional as to warrant attorney fees under § 285. Similarly, bad-faith displayed in pretrial and trial states, by counsel or party, may render the case exceptional under § 285." *Kloster Speedsteel, AB v. Crucible, Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986). However, the statute does not contemplate that "a prevailing alleged infringer should be treated as a 'private attorney general' for invalidating a 'fraudulent patent'. Rather, the purpose is to provide discretion where it would be *grossly unjust* that the winner be left to bear the burden of his own counsel which prevailing litigants normally bear." *J.P. Stevens Company, Inc. v. Lex Tex Ltd, Inc.*, 822 F.2d 1047,1052 (Fed. Cir. 1987); *see also Modine Manufacturing Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed Cir. 1990) ("[T]he decision whether or not to award fees is still committed to the discretion of the trial judge, and '[e]ven an exceptional case does not require in all circumstances the award of attorney fees'".) (quoting *S.C. Johnson & Sons, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir. 1986)). In cases where there has been an express finding of willfulness, the trial court must, in denying attorney fees, "explain why the case is *not* 'exceptional within the meaning of 35 U.S.C. Section 285." *Modine Manufacturing*, 917 F.2d at 543. The Court finds that in examining the totality of the circumstances of this case in light of the Federal Circuit's recent ruling in *Knorr-Bremse* Defendants did not willfully infringe the '012 Patent. Accordingly, Plaintiffs have not proved by clear and convincing evidence that this case is exceptional in nature. *See Avia Group International, Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1567 (Fed Cir. 1988) ("[T]he willfulness of the infringement by the accused infringer may be a sufficient basis in a particular

31

case for finding the case 'exceptional' for purposes of awarding attorney fees to the prevailing patent owner."); *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 657 (Fed. Cir. 1985) ("Having found this to be a case of willful infringement, the district court's discretionary award of attorney fees and costs. . .was proper."). As such, this Court finds that Insituform should not recover attorney's fees and Insituform's request for attorney's fees and costs is denied.

**VI. Licensee Damages**

The licensee damages in this case have been affirmed by the Federal Circuit. 385 F.3d 1360, 1378-79 (Fed. Cir. 2004). The licensee damages are $2,344,287. Here, the licensee damages will be added to whatever damages are calculated for the acts of infringement by Defendants.

**VII.   Prejudgment Interest**

The parties have stipulated that the Court's previous award of prejudgment interest is appropriate. (Pl. Trial Exh. 127, at ¶ 30).

The district court has substantial discretion in determining whether prejudgment interest should be awarded, the rate of such interest and whether it should be compounded or uncompounded. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed. Cir. 1989); *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986). The Court previously found:

> In the instant case, this Court finds that the most appropriate rate to be used to calculate prejudgment interest is the rate specified by Texas law. Under Texas law, prejudgment interest should be calculated according to section 304.003 of the Finance Code which provides that the interest rate should be 10 percent if, as in the instant case, the auction rate is less than 10 percent. TEX. FIN. CODE ANN. § 304.003; *see also Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1986) (holding that the district court did not abuse its discretion by awarding prejudgment interest at the state statutory rate rather than the rate requested by the patentee); *Kerwit Medical Products, Inc. v. N&H Instruments, Inc.* 224 USPQ 679, 691 (N.D. Tex. 1984) (finding that state statutory interest rate to be appropriate to apply to a prejudgment interest award). The Court also finds that the compounding of interest better

32

accomplishes the overriding purpose of an award of prejudgement interest—to make the patent owner whole by compensating him for the lost use of royalty income that he rightfully should have been paid. *See Styrker Corp. v. Intermedics Orthopedics, Inc.*, 891 F.Supp. 751, 833 (E.D.N.Y. 1995) (stating that "the prejudgment interest awarded should be compounded, because the incremental profits [the patentee] would have earned on the lost sales over the infringement period would have been invested in a manner resulting in yearly accrued growth").

Finally, prejudgment interest should be calculated from the time of the infringing activity. *Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986) ("The normal procedure under *Devex* is to award prejudgment interest from the date of infringement to the date of payment, since only such award will satisfy 'Congress' overriding purpose [in section 284] of affording patent owners complete compensation.'") (quoting *Devex*, 461 U.S. at 655, 103 S.Ct. at 2062). In this case, the infringing activity began in 1990 with respect to infringement by CAT/Inliner and in 1992 with respect to infringement by CAT/Inliner licensees.

(Instrument No. 522, at 57-61).

Insituform will therefore be awarded prejudgment interest, calculated at the rate of 10% per annum and compounded annually, from the date this judgment is entered.

## VI.    Conclusion

Based on the foregoing, Plaintiffs are HEREBY ORDERED to submit to this Court, within five days of the entry of this Order, new damages calculations based on the newly determined process switch date, August 5, 1991. The Plaintiffs' updated analysis for damages should mirror Plaintiffs' Exhibit 250-2, and include updated calculations for the following: reasonable royalty on Gulf Coast Market jobs, reasonable royalty on jobs performed by CAT/Inliner licensees, actual damages, and prejudgment interest. As the Court has found that Plaintiffs are entitled to neither enhanced damages nor attorney's fees, it is unnecessary to provide the Court with updated figures related to either.

With this Order, it is the Court's sincere hope that we have finally come to the end of this saga that began over 17 years ago in February 1990. Ironically, this case has lasted almost longer than a patent is valid under the patent laws of the United States. *See* 35 U.S.C. § 154 ("Contents and term of patent; provisional rights"). The Plaintiff began this protracted litigation to protect their intellectual property and have in the process, whether it was their intent or not, succeeded in bankrupting the Defendant as well.

In reviewing the hundreds of pleadings this case has generated, the Court is reminded of the story of the bride Scheherezade and the sultan Schahriar. It was said that Schahriar, a powerful sultan, developed a bitterness and distrust of women when he discovered his first wife was unfaithful to him. Though Schahriar vowed never to marry again, circumstances forced him to wed Scheherezade, a girl who he had known since childhood. Schahriar decided that because he was forced to marry Scheherezade, he would murder her after their wedding night. In an effort to forestall her death, however, Scheherezade regaled Schahriar with a long series of fascinating stories for one thousand and one nights. Just as the bride was able to ensure her life would continue by generating story after story, this case has taken on a life of its own, sustained by the never ending possibility that there must be just one more issue or claim that needs rehashing. With this last opinion, it is the Court's prayer that we may now all rest in peace.

The Clerk shall enter this Order and provide a copy to all parties.

**SIGNED** on this the ___ day of September, 2007, at Houston, Texas.

_____
**VANESSA D. GILMORE**
**UNITED STATES DISTRICT JUDGE**

34